**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:25-CR-224** |
| | : | |
| **ELIAS RODRIGUEZ,** | : | |
| | : | |

**MOTION FOR AN ORDER DIRECTING THE U.S. MARSHALS SERVICE TO
<u>REMOVE ALL RESTRAINTS AT ALL COURT PROCEEDINGS</u>**

Defendant Elias Rodriguez, by and through his undersigned counsel, files this motion in response to this Court's policy that he, along with all other criminal defendants appearing before this Court, be physically restrained with leg shackles during criminal proceedings. This filing should be considered a formal objection to the Court's decision to shackle Mr. Rodriguez and a motion to unshackle him at all future proceedings. Any decision to shackle any criminal defendant, including in pretrial proceedings, must be individualized and made on the record after the defense has been given an opportunity to be heard. Such a decision, which must be made by balancing the defendant's constitutional rights with safety and security needs of the Court, would not be appropriate here. Because the government has chosen to seek the death penalty against Mr. Rodriguez, and because there has been consistent media coverage of every hearing, it is all the more important that the Court carefully scrutinize any courtroom procedures that could negatively impact Mr. Rodriguez's rights.

**I.      Introduction and Relevant Background**

Elias Rodriguez was arrested on May 21, 2025, after identifying himself to law enforcement as the person responsible for the shooting deaths of Sarah Milgrim and Yaron Lischinsky that same evening and informing the officer that he was unarmed. He was thereafter

1

indicted on various D.C. and federal charges, including charges that rendered this case eligible for capital prosecution. Through counsel, Mr. Rodriguez offered to plead guilty and accept a sentence of life without the possibility of parole. Nevertheless, on May 15 of this year the government declared its intent to pursue the death penalty against him.

Because of the government's choice to seek the death penalty, it is particularly important "to insure that every safeguard is observed" in this matter. *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *see also, e.g.*, *United States v. Edelin*, 134 F. Supp. 2d 59, 65 (D.D.C. 2001) ("[t]he United States Supreme Court has recognized that the procedures for sentencing a person to death must be subject to 'heightened standards of reliability' and further established that 'death is different' from other penalties that can be imposed for criminal wrongdoing") (citing *Pulley v. Harris,* 465 U.S. 37, 55 (1984) (Stephens, J. concurring); *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976); *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977)). Because of the greater need for reliability in capital cases, the Supreme Court "has required that 'capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding.'" *Satterwhite v. Texas*, 486 U.S. 249, 263 (1988) (Marshall, J., concurring) (quoting *Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part)). "[I]n capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." *United States v. Perez*, 22 U.S. 579, 580 (1824).

The significant and sustained public interest in this high-profile matter makes it even more imperative that this Court—in the interests of the judicial system's integrity and reducing risks of pretrial prejudice to Mr. Rodriguez—reinforce that Mr. Rodriguez is presumed innocent unless and until the government proves his guilt to a unanimous jury beyond a reasonable doubt.

The media has taken a substantial interest in this matter, maintaining a presence in the courtroom at all proceedings and reporting on the minute details of Mr. Rodriguez's appearance in court, such as whether he is escorted by Marshals, his attire, and even whether he has a beard.[1] This public interest has been strengthened by statements made by public officials, including representatives of the Trump Administration, that prejudge aspects of the case before it has been presented to a jury.[2]

   Since Mr. Rodriguez was first charged in this case more than a year ago, he has been held, without incident, at the D.C. Jail. He has appeared in court five times, and each time he was unshackled during the proceedings—consistent with this Court's previous policy of keeping defendants unshackled at pretrial proceedings in the absence of any compelling or individualized need. Neither this Court nor the U.S. Marshals Service has seen the need to shackle Mr. Rodriguez in the courtroom at any point, and there are no individualized reasons whatsoever to believe that Mr. Rodriguez poses a danger or a flight risk in the courtroom now. To the contrary, outside of the allegations in this case Mr. Rodriguez has no history of violence, and he is presumed innocent of the charges against him. He has been perfectly behaved in each of his court appearances. There is no indication that he has posed, or will pose, any danger in a custodial setting or in the courtroom.

---

[1] *See infra* § V.

[2] *See, e.g.*, Mark Berman, *DOJ will seek death penalty for suspect in fatal shooting at D.C. Jewish museum*, Wash. Post (May 15, 2026) (quoting U.S. Attorney Jeanine Pirro as calling the shooting "a targeted act of terror"); A. Jeong, E. Davies & A. Timsit, *Two Israeli Embassy staffers killed in shooting near Jewish museum in D.C.*, Wash. Post (May 22, 2025) (quoting President Trump as having stated on social media that the killings were "based obviously on antisemitism").

Recently, this Court implemented a new policy of restraining all criminal defendants at all pretrial proceedings. It is the undersigned's understanding that this new policy was implemented in response to a single incident where a defendant attempted to walk out of the courtroom while he was being monitored by two agents of the Marshals Service.[3] On information and belief, this isolated incident was not a result of inadequate training or funding for the Marshals Service, but rather a brief lapse of attention by two individuals on duty in the courtroom that day.

One isolated mistake (having nothing to do with Mr. Rodriguez) after more than ten years of successful practice cannot be reason to change course, reject sound precedent, and indiscriminately shackle Mr. Rodriguez every time he appears in court. Presumptively shackling Mr. Rodriguez would humiliate him in front of his family and the public and needlessly demean a presumptively innocent individual whose behavior in custody and in court has demonstrated that he does not pose a security risk that requires shackling in addition to the presence of multiple Marshals. Moreover, in a high-profile death-penalty case such as this one, where media representatives, members of the general public, and counsel for at least one of the victims' families are routinely in attendance during court proceedings, shackling Mr. Rodriguez may cause spectators to presuppose his guilt and dangerousness warranting a sentence of death. Worse still, it carries the risk of tainting the jury pool. A presumptive shackling policy based on the mishandling of one unrelated situation flies in the face of fundamental principles of due process and fairness. A defendant's liberty may only be restrained after notice has been given,

---

[3] This is the only such incident that the undersigned are aware of happening in the past decade.

counsel have had an opportunity to be heard, and a reasoned decision is issued by an unbiased decisionmaker.

## II.      Historically, This District Has Seen No Need to Categorically Restrain Criminal Defendants, Which is Consistent with Legal Authority.

For over ten years, criminal defendants in the District of Columbia have not been restrained in court unless, and until, the U.S. Marshals Service made an *individualized* request to the presiding United States Magistrate Judge or United States District Judge. This longstanding policy has been greatly successful. The Marshals Service exercised its ability to request that defendants be restrained with discretion—only doing so in cases where individualized determinations were made that particular defendants posed a flight risk or a physical safety risk to the Marshals or to others in the courtroom. This policy aligned with criminal defendants' rights to be presumed innocent, to communicate with counsel, and to maintain their dignity while under criminal prosecution.

This District's longstanding and successful policy was consistent with centuries of legal thought cautioning against the dangers of restraining defendants at court proceedings, as well as with the weight of authority disfavoring categorical shackling policies. The Supreme Court has held that a defendant's right to appear in court unshackled in front of a jury is supported by three "fundamental legal principles." *Deck v. Missouri*, 544 U.S. 622, 630-32 (2007). First, "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Id.* at 630. Second, "[t]he use of physical restraints diminishes" the right to counsel. *Id.* at 631. "Shackles can interfere with the accused's 'ability to communicate' with his lawyer." *Id.* (citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). Third, shackles impinge on the "formal dignity, which includes the respectful treatment of defendants ... and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Id.*

5

For these reasons, the *Deck* Court concluded that a defendant may only be shackled before a jury "in the presence of a special need." *Id.* at 626.

While *Deck* involved the shackling of a defendant in front of a jury during the penalty phase of a capital trial, the Ninth Circuit has held that *Deck*'s reasoning extends to the shackling of defendants during pretrial proceedings—even in non-capital cases. In *United States v. Sanchez-Gomez*, the court considered a policy like the one at issue here. Relying on *Deck*, the Ninth Circuit concluded that permitting the Marshals Service "to produce all in-custody defendants in full restraints for most non-jury proceedings" violates the Due Process Clause. 859 F.3d 649, 660 (9th Cir. 2015) (en banc), *vacated on other grounds*, 584 U.S. 381 (2018).[4] In doing so, the *Sanchez-Gomez* court held that the three "constitutional anchors" identified in *Deck*—the presumption of innocence, the right to counsel and to participate in one's own defense, and the dignity of the judicial process—applied with equal force in proceedings where no jury was present. *Id.* at 660-61.[5] Because of this, the court ultimately concluded that "[b]efore a presumptively innocent defendant may be shackled" in a non-jury proceeding, "the court must make *an individualized decision* that a compelling government purpose would be served and that the shackles are the least restrictive means for maintaining security and order in the courtroom." *Id.* at 661 (emphasis added).

---

[4] The Supreme Court's decision to vacate *Sanchez-Gomez* was based solely on a finding that the case was moot because the defendants who had brought the case were no longer subject to restraints. The Supreme Court's vacatur did not disturb the legal reasoning or logic of the Ninth Circuit's conclusion that a policy of presumptively shackling pretrial defendants at court proceedings is unconstitutional.

[5] *Sanchez-Gomez* noted that a fourth consideration—"that the sight of a defendant in shackles would prejudice the jury against him"—is present in jury proceedings. *Id.* at 660.

*Sanchez-Gomez* echoed the longstanding common-law requirement[6]—reflected in this District's previous policy—that the government establish a specific need before shackling a defendant in court. And judges continue to rely on the thorough reasoning of *Sanchez-Gomez* to question the legality of presumptively shackling pretrial defendants at court proceedings. *See, e.g.*, *United States v. Williams*, 736 F. Supp. 3d 400 (W.D. Va. 2024); *People v. Hamlett*, 193 N.Y.S.3d 658, 661 (Crim. Ct. Queens Cty. 2023) ("[A] general, indiscriminate policy to handcuff any incarcerated person produced to the courtroom is unlawful. A person cannot be shackled during criminal proceedings without a specific factual showing of actual necessity."); *United States v. Henderson*, 915 F.3d 1127, 1133 (7th Cir. 2019) (Hamilton, J., dissenting) (judges may not defer the decision to restrain pretrial defendants to the U.S. Marshals Service).

### III.    Any Decision to Shackle Mr. Rodriguez Must Be Individualized, Well-Reasoned, and Made on the Record.

Due process requires notice, an opportunity to be heard, and a neutral decisionmaker. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). As *Deck*, *Sanchez-Gomez*, and their progeny make clear, any decision to shackle a pretrial defendant must be made on an individualized basis, on the record, and after defense counsel have had the opportunity to be heard.

---

[6] 4 William Blackstone, *Commentaries on the Laws of England* 317 (1769) ("[I]t is laid down in our antient books, that, though under an indictment of the highest nature," a defendant "must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape."); 2 William Hawkins, *Treatise of Pleas of the Crown* 308 (2d ed. 1726) (prisoner at time of arraignment "ought not to be brought to the Bar in a contumelious Manner; as with his Hands tied together, or any other Mark of Ignominy and Reproach: nor even with Fetters on his Feet, unless there be some Danger of a Rescous or Escape"); 2 Matthew Hale, *History of the Pleas of the Crown* 216, 219 (1736) ("The prisoner, tho under an indictment of the highest crime, must be brought to the bar without irons, and all manner of shackles or bonds ... unless there be danger of escape."); 3 Edward Coke, *Institutes of the Lawes of England* 35 (1644) ("It is an abuse that prisoners be chained with irons, or put to any pain before they be attainted"); *see generally Sanchez-Gomez*, 859 F.3d at 654-55 (discussing the "[e]arly American" tradition of prohibiting shackling without any individualized finding).

7

To be sure, there are certain cases that may require special safety and security precautions. *Deck*, 544 U.S. at 632. But "before a presumptively innocent defendant may be shackled, the court must make an individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom." *Sanchez-Gomez*, 859 F.3d at 661. And Courts "cannot delegate this constitutional question to those who provide security, such as the U.S. Marshals Service. Nor can courts institute routine shackling policies reflecting a presumption that shackles are necessary in every case." *Id.*; *cf.*, *e.g.*, *United States v. Honken*, 541 F.3d 1146, 1153 (8th Cir. 2008) (noting that the district court made the decision to shackle defendant only after an evidentiary hearing on the issue and based upon "ample evidence in the record").

In recognition of this principle, other courts have implemented formal procedures to ensure that defendants are not presumptively shackled for pretrial proceedings. The Western District of Washington published a standing order in May 2024 directing that "the United States Marshal should not routinely bring in-custody defendants ... to court in shackles or similar restraints, whether full-body or partial." General Order 05-24, *Use of Restraints on in-Custody Persons in the Courtroom*, W.D. Wa. May 3, 2024.[7] Instead, the presiding judge is required to make an *individualized* assessment, based on several factors, to decide whether shackling is necessary. *Id.* The default presumption is that shackling is not permitted. This order is consistent with the law and grounded in sound policy. Similarly, the Eastern District of California has promulgated a local rule concerning pretrial shackling. *See* E.D. Cal. Local Rule 401, "Shackling of In-Custody Defendants." It directs courts to assess whether pretrial restraints are necessary in

---

[7] https://www.wawd.uscourts.gov/sites/wawd/files/05032024GO05-24UseofRestraintsonInCustodyPersons.pdf.

a particular case even before the first appearance. At that point, the Marshals must make an individualized recommendation in writing to the Magistrate or District judge. *Id.* The judge then reviews all other available information along with the submission of the Marshals before making an initial determination. *Id.* That determination is then distributed to defense counsel and the government before any hearing begins. The Rule empowers counsel to request a modification to the restraint level at any time.

In light of Mr. Rodriguez's history in this case, it is clear that no "compelling government purpose would be served" by shackling him, nor is shackling the "least restrictive means for maintaining security and order in the courtroom" in this matter. *Sanchez-Gomez*, 859 F.3d at 661. Any shackling decision must be made on the record and only after consideration of any reasons proffered by the government or the Marshals Service and an opportunity for Mr. Rodriguez to be heard. Consistent with the factors identified by the Supreme Court in *Deck*, any justification for shackling proffered by the government or the Marshals Service would not be sufficient to outweigh the compelling constitutional interests present here.

## IV. *Deck*'s "Three Constitutional Anchors" Weigh Against Shackling Mr. Rodriguez.

In rejecting categorical shackling at the trial and pretrial stages, the courts in *Deck* and *Sanchez-Gomez* relied on *Deck*'s three "constitutional anchors": shackling undermines the presumption of innocence, diminishes the right to counsel, and undercuts the personal dignity of a criminal defendant and the formal decorum of court proceedings. *See supra* §§ II, III; *Deck*, 544 U.S. at 630-32. And, while *Deck* involved shackling during the penalty phase of a capital trial, *Sanchez-Gomez* made clear that these anchors apply with equal force to pretrial proceedings where no jury is present. If these principles apply in pretrial proceedings in a non-capital case,

surely they apply in cases like this one where the death penalty is at issue and the defendant's life is at stake. This Court should apply them here.

### a. Presumption of innocence

As an initial but important matter, Mr. Rodriguez—like all other defendants who appear before this Court in advance of trial—is presumed innocent. To shackle him every time he comes to court "undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. At a trial on the merits, shackling "suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook*, 106 S. Ct. 1340). The presumption of innocence is particularly strong at pretrial proceedings; at this point, a defendant may not have been provided full discovery, and his liberty is instead being restrained based only on the sworn statement of a single law enforcement officer rather than robust evidence submitted to an impartial jury of the defendant's peers.

No one is immune from the unconscious bias that stems from seeing a criminal defendant in shackles at pretrial proceedings. A 2015 study on the influence of emotion on judicial decisionmaking found that this kind of unconscious response "influences law interpretation and application and that it does so even in the relatively emotionally arid (compared to trial) setting of pretrial motions, where some have argued that law is most likely to be correctly applied." Andrew J. Wistrich et al., *Heart Versus Head: Do Judges Follow the Law or Follow Their Feelings?*, 93 Tex. L. Rev. 855, 899 (2015). The study found that "without being consciously aware of it, [judges'] thumbs were on the scale, covertly tipping the balance toward the more likeable or sympathetic litigant." *Id*. This research shows that juries are not the only parties

susceptible to unconscious bias in a courtroom.[8] The Supreme Court's constitutional concerns laid out in *Deck*, therefore, do not disappear when a defendant appears shackled at pretrial proceedings.

The nature of the crimes with which Mr. Rodriguez is charged does not alter the presumption of innocence or its relevance to the shackling determination. Even though Mr. Rodriguez is accused of acts of serious violence, he is presumed innocent of those crimes. And, after all, *Deck*, *Sanchez-Gomez*, and the policies of other districts that recognize a presumption against shackling make no exception for defendants whose charges involve violent conduct. The presumption of innocence weighs against shackling Mr. Rodriguez.

### b. Right to counsel

Shackling Mr. Rodriguez also interferes with his ability to communicate with his attorneys and to participate in his own defense. *Deck*, 544 U.S. at 631. Meaningful communication during court proceedings is paramount to effective representation. *See Allen*, 397 U.S. at 344 ("[O]ne of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint.").

The restrictions on Mr. Rodriguez's Sixth Amendment rights in this regard are not limited to the physical inhibition imposed by the shackles; the presence of restraints like leg shackles can also take a cognitive and mental toll. *Deck*, 544 U.S. at 631 (shackles interfere with defendant's "mental faculties," thereby undermining his right to counsel). Even though leg

---

[8] Jeffrey J. Rachlinksi & Andrew J. Wistrich, *Judging the Judiciary by the Numbers: Empirical Research on Judges*, 13 Ann. Rev. L. Soc. Sci. 203, 219 (2017) (discussing scenarios in which emotional or unconscious responses have been shown to influence judicial decisionmaking in the criminal context).

restraints may allow for defendants to write and move about while in court, the psychological impact of being shackled pretrial and the resulting hindrances on a defendant's ability to participate in proceedings are significant. *See, e.g.*, *Williams v. United States*, 52 A.3d 25, 35 (D.C. App. 2012) (recognizing that "communication with counsel and effective participation in one's defense" can be affected "psychologically" by the use of restraints). Appearing in court is a stressful experience, and "[a]dding shackles to that experience can cause people to disassociate with the proceedings, ultimately limiting a defendant's ability to actively participate." Madison Wendt, *Like a Bear on a Chain: Implications of Shackling Defendants in Bench Trials*, 29 Kan. J.L. & Pub. Pol'y 403, 413 (2020). Walking into the courtroom chained, ankles shackled and movement restricted, with the sound of clinking metal accompanying every motion, in view of media representatives, spectators, marshals, clerks, court reporters, and attorneys is likely to make Mr. Rodriguez hyperaware of his physical presence, rather than enabling him to focus on his communications with his counsel and on the proceedings.

In *Deck*, the Supreme Court determined that the use of shackles diminishes a defendant's right to counsel by interfering with his "mental faculties." 544 U.S. at 631 (citing *People v. Harrington*, 42 Cal. 165, 168 (1871)). Research in embodied cognition—the study of how a person's physical state can influence their mental processes—supports this. One study demonstrated that individuals placed in physically constricted posture, such as with their shoulders dropped or legs together, feel less powerful and perform worse on abstract thinking than those who are not so restricted. Fatma E. Marouf, *The Unconstitutional Use of Restraints in Removal Proceedings*, 67 BAYLOR L. REV. 214, 261 (2015). Leg shackles constrict the body even more than the postures examined in the study, suggesting that shackles may have an even greater impact on mental processing and behavior. Related research on "enclothed cognition"

likewise demonstrates that what a person wears can shape their psychological state and behavior. *Id*. at 261-63. Metal chains, as used in restraints, carry powerful symbolic meaning, including associations with criminality, submission, and a lack of power. *Id.* at 264. By hearing, seeing, and feeling the chains on his body, wearing restraints of any kind may reinforce feelings of helplessness and alter Mr. Rodriguez's cognition in court. *Id*.

These combined physical and psychological effects demonstrate that the decision to shackle Mr. Rodriguez should not be made routinely or lightly, as it can interfere with his concentration, his communication, and his ability to meaningfully participate in his own defense and in proceedings.

### c. Dignity of defendants

Finally, as *Deck* emphasized, dignified and respectful treatment of criminal defendants is of paramount importance to the integrity of the criminal justice system. *See* 544 U.S. at 631. Forcing Mr. Rodriguez—without a particularized reason for doing so—to shuffle, shackled, through the courtroom to the defense table, in view of lawyers, court staff, loved ones, members of the public, and media representatives, is completely contrary to this goal. This is especially true in a case that has drawn substantial interest from the press, in which reporters have consistently been present in court, and in which the death penalty will be pursued.

The courtroom is "the most visible and public manifestation of" our justice system. *See Sanchez-Gomez*, 859 F.3d at 662. Crucially, therefore, "judges must seek to maintain a judicial process that is a dignified process." *Deck*, 544 U.S. at 631. The Supreme Court has recognized that, in doing so, judges must recognize the importance of respectful treatment of criminal defendants. *Id.* ("The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with

13

which Americans consider any deprivation of an individual's liberty through criminal punishment."). The value placed by that justice system on the dignity of a defendant is on full display in pretrial proceedings in a high-profile, highly publicized death-penalty case in federal court. Indiscriminate shackling of Mr. Rodriguez at pretrial proceedings will fundamentally undercut the dignity that he, like all criminal defendants, is owed.

"A presumptively innocent defendant has the right to be treated with respect and dignity in a public courtroom, not like a bear on a chain." *Sanchez-Gomez*, 859 F.3d at 661. Rejecting the indiscriminate shackling of Mr. Rodriguez is essential, not only to his dignity, but also to maintaining the legitimacy and dignity of the judicial process. The Supreme Court recognized decades ago that the use of physical restraints on defendants is "something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*, 397 U.S. at 344. That principle applies in full force here, and this Court has no reason to sanction shackling Mr. Rodriguez.

### V. There Are No Independent Individualized Reasons to Shackle Mr. Rodriguez.

*Deck*'s factors and the accompanying presumption against indiscriminate shackling require that Mr. Rodriguez be shackled only upon a particularized finding by this Court, made on the record and after Mr. Rodriguez is heard, that a "special need" for shackling is present. *See Deck*, 544 U.S. at 626; *see also Sanchez-Gomez*, 859 F.3d at 661 (requiring an "individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom"); *cf. United States v. Wardell*, 591 F.3d 1279, 1294 (10th Cir. 2009) (finding no abuse of discretion where district court ordered defendant to wear stun belt but "clearly articulated its reasons for the safety measure"). No such finding would be justified here.

The fact that Mr. Rodriguez has no violent criminal history weighs against shackling him. Mr. Rodriguez has *never* been convicted of any act of violence, anywhere, in any court. Indeed, he has never been so much as arrested prior to this case. And, again, the violent nature of the crimes with which he is charged does not change the analysis; after all, he is presumed innocent of those crimes. *See supra* § IV.a.

Also weighing against a need for shackling in court is the fact that Mr. Rodriguez has committed no acts of violence—or, for that matter, any significant acts of misconduct—since his arrest in this matter last May. To the contrary, it is alleged that Mr. Rodriguez turned himself in to law enforcement immediately after the events in question, informing them that he was unarmed. He did not resist and went along with law enforcement peacefully and cooperatively.

In fact, Mr. Rodriguez's disciplinary record has been entirely without incident in the more than thirteen months since his arrest. There is no indication that he has engaged in any misconduct or that he poses any risk in custody at the D.C. Jail. There is no indication that he has engaged in any violence or other misconduct or posed any risk on his way to or from court in any of the five hearings that have taken place to date, or that he ever was violent, made threats, or otherwise acted out while in the courtroom. Rather, he has behaved politely and respectfully each time he has appeared in court.

The high-profile nature of this case weighs against shackling. As this Court is likely aware, when Mr. Rodriguez appears in the courtroom there are routinely members of the media, victims' representatives, and other members of the public present in the courtroom. The minute details of Mr. Rodriguez's appearances are reported by the press. *See, e.g.*, Holmes Lybrand, *Man accused of killing 2 Israel embassy staffers in DC pleads not guilty* (CNN Sept. 4, 2025) ("Before Thursday's hearing, Rodriguez was seen walking in shackles around his legs and wrists

15

down the hall of the D.C. federal courthouse, as deputy U.S. Marshals escorted him to a small holding cell behind the courtroom"); Zach Montague, *Man Accused of Killing Israeli Embassy Staffers Pleads Not Guilty* (N.Y. Times Sept. 4, 2025) (describing Mr. Rodriguez as "[s]tanding beside his lawyer in an orange jumpsuit during a brief arraignment hearing"); Chris Nesi, *DC Jewish Museum terror suspect Elias Rodriguez faces 'mountain of evidence' as he's arraigned for execution of 2 Israeli diplomats* (N.Y. Post Sept. 4, 2025) ("Rodriguez, 31, appeared in DC federal court Thursday for a 10-minute hearing while wearing an orange jumpsuit, glasses and sporting a beard"); Ryan Knappenberger, *Jewish museum shooting suspect pleads not guilty to murder, terrorism charges* (Courthouse News Service Mar. 3, 2026) (reporting that Mr. Rodriguez "was shadowed by a U.S. Marshal while entering his not guilty plea at the podium"). And Mr. Rodriguez has been the subject not only of media attention, but also of sustained commentary by representatives of the Department of Justice and the Trump Administration. The pretrial shackling of a high-profile defendant like Mr. Rodriguez raises particular constitutional problems because heightened attention on the defendant—including on his appearance in the courtroom—can undermine the presumption of innocence and the dignity of the judicial process and may taint the jury pool.

This is all underscored even more by the fact that this is a death-penalty case. Capital cases are *sui generis* in several regards, one of which is the "'acute need' for reliable decisionmaking when the death penalty is at issue." *Deck*, 544 U.S. at 632. In this context, a defendant's appearance "in shackles ... almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community," an implication that places a "'thumb [on] death's side of the scale'" in the jury's decisionmaking. *Id.* at 633 (quoting *Sochor v. Florida*, 504 U.S. 527, 532 (1992)). The pretrial shackling of Mr.

Rodriguez, a capital defendant, only serves to strengthen this implication, signaling to the public—members of whom will eventually make up the jury pool—that Mr. Rodriguez is dangerous. Similarly, *Deck*'s recognition that shackling undermines the dignity of defendants is underscored in a capital case, where the regularity and integrity of proceedings is paramount. *See, e.g.*, *Brown v. Wainwright*, 454 U.S. 1000, 1001 (1981) (Marshall, J., dissenting) (citing *Gardner v. Florida*, 430 U.S. 349, 354 & n.5 (1977)). "Solemnity and that indefinable but knowable ambience of evenhanded judicial disinterest and respect for the dignity of individuals are components of a fair trial," particularly a capital trial. *Marquez v. Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994). Neither the defendant nor the public can be assured of this integrity and fairness if these principles are undermined in public proceedings at the pretrial stage.

The U.S. Marshals Service consists of highly skilled men and women who are perfectly capable of supervising (and often do supervise) defendants with histories of violence or with records of prison misconduct during pretrial proceedings without the need for shackles. And Mr. Rodriguez does not fit into one of these categories. There is no particularized reason to believe Mr. Rodriguez would pose a risk during a pretrial proceeding. Shackling in this case is undignified, unwarranted, and contrary to Mr. Rodriguez's fundamental constitutional rights.

### VI.    Conclusion

For the foregoing reasons, Mr. Rodriguez respectfully requests that the Court order the U.S. Marshals Service to present him unshackled at all future proceedings absent a demonstration of a particularized need.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/*_____

17

Elizabeth Mullin
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

Eric K. Klein
Johnson & Klein, PLLC
5398 Manhattan Circle
Boulder, CO 80303
(303) 444-1885

Victor J. Abreu
Supervisory Assistant Federal Defender
Federal Community Defender Office, EDPA
601 Walnut Street, Ste 540 West
Philadelphia, PA 19106
(215) 928-1100